UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**LOUEMMA CROMITY,**

   **Plaintiff,**

**v.**            **Case No. 6:22-cv-924-CEM-EJK**

**CITY OF ORLANDO,**

   **Defendant.**

_____/

## ORDER

   THIS CAUSE is before the Court on Defendant's Motion for Summary Judgment (Doc. 21), to which Plaintiff filed a Response in Opposition (Doc. 29) and Defendant filed a Reply (Doc. 30). For the reasons stated herein, Defendant's Motion for Summary Judgment will be granted.

## I.   BACKGROUND[1]

   Plaintiff, an African American, was hired in December 2018 by Defendant's Chief Procurement Officer, David Billingsley, to the position of Assistant Chief Procurement Officer. (Pl. Dep., Doc. 22-1, at 49, 51; Billingsley Dep., Doc. 22-5, at

---

[1] The record in this case contains significantly more details regarding the interactions between Plaintiff and her subordinates and supervisors. However, the cumulative weight of that evidence is not material to the issues in this Order, so only a sampling of those interactions has been included.

6, 9; Billingsley Decl., Doc. 22-6, at 2; Pl. Decl.,[2] Doc. 29-1, at 1–2).[3] In this role, Plaintiff reported to Billingsley as her "immediate supervisor," (Doc. 22-6 at 2; Doc. 22-5 at 9), and Michelle McCrimmon, Defendant's Deputy Chief Financial Officer, as her "second level supervisor," (Banks Dep., Doc. 22-8, at 23; Doc. 22-5 at 7).[4] Plaintiff was responsible for ten to twelve employees, all purchasing agents,[5] who reported to her. (Doc. 22-1 at 70; Doc. 22-6 at 2).

In June 2019—approximately six months into Plaintiff's employ with Defendant—Maureen Bowman, a Purchasing Agent who reported to Plaintiff, submitted her resignation to Billingsley. (Doc. 22-1 at 51–54, 297 (showing Bowman's title), 298 (resignation letter)). Bowman stated that the reason for her resignation was because Plaintiff "belittled" her "in front of [her] colleagues" by calling her "an 'Average Joe' with 'no knowledge' since [Bowman] d[id] not have a college degree." (*Id.* at 298). Bowman also requested that during the remainder of her time with Defendant that she "not have any interactions with [Plaintiff]." (*Id.*).

---

[2] Defendant's Reply argues that the Court should exclude this declaration, but because Defendant is entitled to summary judgment even considering the declaration, the Court need not address this argument.

[3] All citations reference the electronic docket page numbers.

[4] McCrimmon took over this role sometime between mid-December 2019 and early-January 2020. (Doc. 22-7 at 7–9). Prior to that time, another Deputy Chief Financial Officer with Defendant, Brian Battles, served as supervisor for Defendant's Procurement and Contracts Division. (*Id.*).

[5] The purchasing agents were classified at different levels by Defendant, such as Purchasing Agent II, Purchasing Agent III, and Senior Purchasing Agent, (*see* Doc. 29-2 at 6), but these designations are not relevant to the issues in this Order, so they will all be referred to generally as purchasing agents.

In response to Bowman's resignation, Plaintiff drafted a "Note to File" in which she explained her view of the event that led to Bowman's resignation. (*Id.* at 296). According to Plaintiff, Bowman volunteered that she did not have a degree—a fact that Plaintiff had previously been unaware of—in the context of a discussion regarding obtaining additional certifications. (*Id.*). When a co-worker reassured Bowman that "a degree did not matter," Plaintiff disagreed and "explained to the team that a degree did matter." (*Id.*). Plaintiff then indicated "that individuals who strived for advance learning, through obtaining a degree and certification . . . would be able to differentiate themselves from the average joe." (*Id.*). In closing, Plaintiff noted that she had "treated [Bowman] with the upmost respect," "assisted her daily in reassigning her task[s] to other team members," and "worked with her to ensure that she was successful." (*Id.*).

In October 2019, Fabio Henao, another Purchasing Agent who reported to Plaintiff, emailed Renea Drew, who worked in Defendant's Labor Relations Department, with a list of concerns about his interactions with Plaintiff. (*Id.* at 57–59, 302–03, 303 (listing Henao's title); Doc. 22-5 at 37 (indicating that Drew was "part of labor relations")). According to Henao's email, he "heard from a third party" that Plaintiff had made comments about the use of "'broken English' in reference to co-workers whose English is not the first language[]," and as to Henao specifically, that Plaintiff stated: "I would never hire him." (Doc. 22-1 at 302). Additionally,

during a staff meeting while discussing potential changes to the department and "looking at [Henao]," Plaintiff made "comments like 'since you don't like change' and 'you have a lot to learn.'" (*Id.*). Following those comments, during the meeting, Henao asked Plaintiff "why she was picking on [him]" and Plaintiff "got evasive." (*Id.*). The following day, Plaintiff asked Henao to meet with her in a conference room, and Henao "asked for a witness" to be present during the meeting, which Plaintiff reluctantly agreed to. (*Id.*). During that interaction, according to Henao, Plaintiff "expressed she felt angry for the things that [Henao] had said" and stated that she "ha[d] been doing this for more than 30 years," "you all do it wrong here at the City and have a lot to learn," and "even a high school kid could do what you guys do here." (*Id.* at 302–03). Finally, Henao expressed his frustration that the Certified Purchasing Professional Certification he obtained from the American Purchasing Society "seem[ed] to be not enough of a merit for [Plaintiff]" since she stated, "you just bought that Certification." (*Id.* at 303). Henao's remaining concerns related to interactions regarding assigned projects and tasks and Plaintiff getting "angry" in response to those discussions. (*Id.*).

In January 2020, Henao resigned, citing "disrespectful treatment" from Plaintiff, including an "overall feeling of not being spoken to respectfully [by Plaintiff] in meetings and personal interactions." (*Id.* at 309). Henao also recounted a specific incident with Plaintiff where she called Henao into a conference room and

"instructed him to physically point on the org chart and state he reported to [Plaintiff]." (*Id.*). Plaintiff believed that this was not the real reason that Henao resigned and that he really resigned because he did not get a promotion that was promised to him. (Doc. 29-1 at 8).

In January 2020, McCrimmon and Billingsley met with Plaintiff to discuss the fact that three employees[6] had complained to Defendant's Labor Relations Department about Plaintiff, including Henao, who was resigning due to Plaintiff's treatment. (Doc. 22-1 at 309; McCrimmon Dep., Doc. 22-7, at 10–11). According to McCrimmon, Plaintiff "immediately responded that she was being disrespected constantly by staff" and particularly by two of the employees who had complained about her. (Doc. 22-1 at 309). Plaintiff acknowledges that this meeting occurred but denies making these statements or being put on notice of any complaints by subordinates or performance issues.[7] (*Id.* at 66–70). McCrimmon set a follow-up meeting with Plaintiff for two weeks and advised Plaintiff "to do some 'self-reflection' of negative interactions with staff or reasons that could lead them to complain." (*Id.*).

---

[6] The three employees who had complained to Defendant's Labor Relations Department were Henao, Brian Ferrier, and Angela Thomas, all purchasing agents who reported to Plaintiff. (Doc. 22-7 at 11; Doc. 29-2 at 6 (showing Henao's, Ferrier's, and Thomas's titles)).

[7] Plaintiff denies being put on notice of any problems with her performance prior to being placed on a PIP in May 2020. (*See, e.g.*, Doc. 22-2 at 23 ("I was never told that there were issues with me or my performance"); Doc. 22-8 at 296, 298, 302). The Court acknowledges this dispute but finds that it is not material to the issues in this Order.

According to McCrimmon, a follow-up "coaching meeting[]" between McCrimmon and Plaintiff occurred on February 14, 2020. (Doc. 22-7 at 14; Doc. 22-1 at 310). An additional follow-up meeting occurred on March 6, 2020. (Doc. 22-1 at 310; Doc. 22-7 at 14). Plaintiff denies that either of these meetings were "coaching sessions" and stated that McCrimmon verbally "attacked" and "accused" her during these meetings. (Doc. 22-1 at 74).

Later in the day on March 6th, Billingsley and McCrimmon met to discuss placing Plaintiff on a Performance Improvement Plan ("PIP"). (Doc. 22-1 at 310; Doc. 22-7 at 20–22; Doc. 22-8 at 23). Shortly thereafter, Billingsley and McCrimmon began drafting a PIP for Plaintiff. (Doc. 22-7 at 26–27; 72–76). However, due to the disruption from COVID-19 and Defendant requiring employees to work remotely, Billingsley decided against placing Plaintiff on a PIP at the time. (Doc. 22-7 at 24–25; Doc. 22-8 at 24).

On Friday, May 29, 2020, Plaintiff was placed on a PIP[8] and informed of such in a meeting with Billingsley and Lynne Banks, Defendant's Chief Negotiator and Chief Labor Relations Official. (Pl. Dep. Exs., Doc. 22-2, at 20–23, 41; Banks Decl., Doc. 22-12, at 2 (listing Banks' title)). The PIP, which was scheduled to begin immediately and be in place for a period of ninety days, outlined "a plan to correct

---

[8] It is not material to the issues in this Order who with Defendant made the ultimate decision to place Plaintiff on the PIP.

performance in the following areas:" (1) communication with Billingsley as the Chief Procurement Officer, (2) communication with Plaintiff's subordinates, i.e., the purchasing agents, and (3) communication and collaboration with other divisions of Defendant. (*Id.* at 20–22). Among other requirements, the PIP mandated that Plaintiff's interactions with the purchasing agents be "professional, genuine, and positive," (*id.* at 20), which would be monitored via observation by Billingsley along with "one-on-one update meetings with staff," (*id.* at 21). Plaintiff disagreed with the PIP, thought it was "unfair," and asserted that she had not been informed prior to the PIP that there were any issues. (*Id.* at 23; Doc. 22-1 at 299–301).

The following Monday, June 1, 2020, Plaintiff began sending emails to various supervisory employees within Defendant's organization in response to being placed on the PIP. (Doc. 22-1 at 41; Doc. 22-8 at 298). That day, Plaintiff sent an email to Christopher McCullion, Defendant's Chief Financial Officer, (Apr. 27, 2021 Memo, Doc. 22-10, at 3 (listing McCullion's title)), with the subject line: "Fabio Henao." (Doc. 22-2 at 41). The email referenced the meeting with Billingsley and Banks during which Plaintiff was informed of the complaint by Henao and placed on the PIP. (*Id.*). The remainder of the email described Plaintiff's view of the events with Henao. (*Id.* at 41–43).

The same day, Plaintiff sent an email to Banks noting that it was "critical and extremely important" for Plaintiff to provide Banks "information to assist" Banks

with her "complete understanding," claiming that "[t]he complaints and information spoken against [Plaintiff]" were "one sided" because she had not "had the opportunity to address any concern or complaints." (Doc. 22-8 at 298). Banks responded the following day, June 2, 2020, and let Plaintiff know that she would add Plaintiff's email to her file. (*Id.* at 297). Plaintiff responded again, requesting "documentation, evidence, notes, conversation, or samples of what has led to this PIP." (*Id.* at 296). Banks forwarded this email to Billingsley, requesting that he provide "direct examples" to Plaintiff "of any shortcomings or less than positive results from her [PIP]" because Plaintiff appeared "to not be absorbing the fact that this is not an isolated incident." (*Id.* at 295).

On June 4, 2020, at 2:05PM, Plaintiff sent an email to Billingsley in response to being placed on the PIP and copied Banks, McCullion, and Drew.[9] (*Id.* at 299). Plaintiff wrote that "[a]s previously stated to you and . . . Drew several months ago, [McCrimmon] [h]as been harassing me because of the statements that [Henao] made." (*Id.*). Plaintiff then set forth several complaints about issues that she had with her purchasing agents and stated that she believed those employees "had ulterior motives" for complaining. (*Id.*). Plaintiff then stated that: "[i]t appears that there are two rules, one for people of color and one for people who are not of color"; Plaintiff

---

[9] All of the parties were included in to "To:" line of the email, but the body of the email was addressed to Billingsley. (Doc. 22-8 at 299).

was "denied due process, discriminated against, [and] not allowed to prove [her] innocence"; Plaintiff's employees "ha[d] issues with an African leader"; and Plaintiff was "subjected to racist behavior." (*Id.*). Finally, Plaintiff stated as follows: "When I requested for the two white employees to be placed on a PIP it has not happened, and now I, as their target, and I as their manager, an African American, based upon their complaints alone, [have] been placed on a PIP." (*Id.* at 300).

Four minutes later on the same day, Plaintiff sent an email to McCullion "requesting to have the [PIP] rescinded," noting that she "believe[d] that [she] ha[d] documented the concern and why this would be in everyone's best interest." (*Id.* at 304). The following day, McCullion responded to Plaintiff, addressing both the email to Billingsley and the email requesting that the PIP be rescinded. (*Id.* at 303). McCullion noted that despite Plaintiff's contentions to the contrary, he "believe[d]" that Plaintiff had been "given multiple opportunities over the last many months to demonstrate improvement . . . before a PIP was established." (*Id.*). McCullion concluded: "At this time I do not have any information that would make me think that the [PIP] would not be helpful, and I do not see a reason to rescind it. But I will continue to evaluate the situation. You should continue to work primarily with [Billingsley] on this, but I am always willing to hear you out, and of course you know that you can contact Employee Relations at any time about any concerns you have." (*Id.*). Further, McCullion stated that he would "be talking with [Billingsley]

about" the purported behavior of Plaintiff's subordinates, noting that "expectations for professionalism and courtesy apply across the board" and that "everyone should be held to the same high standard." (*Id.* at 304).

Plaintiff sent a follow up email to Billingsley on June 8, 2020, copying Banks, McCullion, and Drew, stating: "As we all know discrimination and racism is serious and real. Not bringing it to [the] forefront does not make [it] less serious or real or that it has occurred. People of color should not have to suffer in silence or be abused." (Doc. 22-2 at 44). Banks responded to Plaintiff within twenty minutes advising her to "[p]lease set up a meeting with [Drew]" and noting that "[i]f you feel that you have faced discrimination, we take that very seriously" and "need to be able to gather specifics . . . so that it can be investigated properly." (*Id.*).

Plaintiff sent a follow up email to McCullion on June 15, 2020. (Doc. 22-8 at 302). In that email, Plaintiff states that she "never spoke to" Billingsley or McCrimmon "concerning any performance issue that they perceived to have with [Plaintiff] prior to being placed on a PIP."[10] (*Id.*). Plaintiff then detailed the meetings that she had with Billingsley and McCrimmon in January and McCrimmon in February and March and stated that she reported McCrimmon to "Employee

---

[10] Similar emails from Plaintiff continued after this date. (*See, e.g.*, Doc. 22-2 at 51 (email from Plaintiff to Drew and copied to McCullion, dated June 16, 2020, requesting "[a]ll documentation, dates, times, of complaints received by Employee Relations and . . . McCrimmon from the below employees:" Bowman, Henao, Thomas, Ferrier, and any other employee who has complained)).

Relations" following the March 6th meeting, but no action was taken. (*Id.*). McCullion then forwarded this email to Banks, copying Billingsley and McCrimmon, noting that he "would never want to dismiss any accusations of mistreatment, especially ones regarding race, gender, etc." but that something must be "interfering with [Plaintiff]'s ability to accurately perceive what has been going on, and what has been communicated to [Plaintiff] over the course of many months" because Plaintiff's characterizations regarding McCrimmon are "wildly inaccurate." (*Id.* at 301).

On June 17, 2020, Plaintiff followed up to Banks' email advising Plaintiff to set up a meeting with Drew about an investigation into any alleged discrimination. (Doc. 22-2 at 46). Plaintiff told banks that "when [Plaintiff] wanted to speak to [Banks], [Banks] w[as] not open to hear [Plaintiff]," so Plaintiff did not "believe there [wa]s a need to continue this effort." (*Id.*). Banks, Drew, and Plaintiff then engaged in a back-and-forth email exchange where Banks and Drew insisted that allegations of discrimination were a serious matter that required investigation by Defendant, but Plaintiff declined to meet. (*Id.* at 47–51). Ultimately, Plaintiff refused to meet with anyone to permit Defendant to investigate any of Plaintiff's allegations regarding discrimination. (Doc. 22-1 at 153). Plaintiff then completed the ninety-day duration of the PIP. (Doc. 22-7 at 40; Doc. 22-8 at 27).

Throughout September and October 2020, Yonney Dominguez Fundora, another Purchasing Agent who reported to Plaintiff, began documenting his interactions with Plaintiff via emails to himself[11] because Plaintiff "humiliating" him was "becoming wors[e]" and he felt "very threaten[ed] by her.[12] (Doc. 22-8 at 228; *id.* at 237 (listing Fundora's title); *id.* at 228–37 (showing the date span of the emails)). On November 9, 2020, Fundora asked McCrimmon to meet with him, and McCrimmon scheduled to meet with Fundora that afternoon.[13] (Doc. 22-1 at 311; Doc. 22-7 at 40). "During the meeting," Fundora "provided examples of statements" made by Plaintiff that concerned him, (Doc. 22-1 at 311), including Plaintiff telling her subordinates to "not . . . go to . . . Billingsley" and "that she knows how to get

---

[11] Fundora noted in the first email that he had previously been documenting his interactions with Plaintiff on paper. (Doc. 22-8 at 228).

[12] Some of the concerns documented in these emails—which spanned between September 28 and October 21, 2020—included Plaintiff: calling another employee "a bitch"; yelling at Fundora and calling him "unprofessional"; "scold[ing]" Fundora and other employees for having conversations with Billingsley; telling Fundora that Plaintiff would have to extend his probationary period "because [Billingsley] is a racist and . . . wanted to get rid of [Fundora]"; threatening to extend Fundora's probation and telling him that he could not report her for discrimination because "[she is] black"; calling other employees "racist"; requiring employees to read for thirty minutes every day, including weekends, and threatening Fundora's job when he instead chose to spend time with his family on the weekend; and telling employees that she knew "how to get rid of union employees" and providing a detailed account of how she would do so. (Doc. 22-8 at 228–36). It is not clear from the record whether all these concerns were reported to Defendant. To the extent they were not reported to Defendant, they are not material to the issues herein. Therefore, only Fundora's concerns communicated to Defendant, as documented in the record, have been considered for the purposes of this Order.

[13] At the time, Fundora expressed a concern to McCrimmon about meeting in her office over fears that Plaintiff would see Fundora in McCrimmon's office, so McCrimmon arranged to meet later that afternoon in a conference room on the other side of the office. (Doc. 22-1 at 311). Fundora also requested that McCrimmon not send a meeting invitation because Plaintiff had access to his electronic calendar. (*Id.*).

rid of union employees," (Doc. 22-7 at 41). McCrimmon referred Fundora to Labor Relations to report these concerns. (*Id.* at 42; Doc. 22-1 at 311).

Within the next few days,[14] Fundora contacted Banks to report these and other concerns. (Doc. 22-8 at 28–31). As a result of Fundora's report to Labor Relations, on Friday, November 13, 2020, Billingsley and Drew met with Plaintiff to discuss an investigation into Plaintiff by Defendant's Labor Relations Department. (Doc. 22-1 at 182; Doc. 22-5 at 61; Pl. Decl. Exs., Doc. 29-2, at 25–26). Plaintiff stated that while she was informed of the investigation, she was not informed as to the origin of the investigation, i.e., Fundora's complaint. (Doc. 22-1 at 183–84). That Sunday evening, November 15, 2020, Plaintiff sent a memorandum via email to Billingsley outlining her "Performance Concerns" for Fundora. (*Id.*; Doc. 22-5 at 46–56, 126–32).

Between November 16 and 18, 2020, Defendant's Labor Relations Department conducted an investigation into Fundora's complaint, including interviewing Plaintiff and five employees within Defendant's Procurement and Contracts Department. (Doc. 22-5 at 133–39). While Plaintiff "denied all of the . . . allegations" brought against her during the investigation, Defendant's investigation

---

[14] It is not clear from the record precisely when Fundora reported his concerns about Plaintiff to Banks, but based on the progression of events, it must have occurred sometime between November 9, 2020, when Fundora contacted McCrimmon, (Doc. 22-1 at 311), and November 13, 2020, when Billingsley and Drew met with Plaintiff to inform her of the Labor Relations investigation into Plaintiff, (Doc. 22-1 at 182; Doc. 22-5 at 61; Doc. 29-2 at 25–26).

nonetheless concluded that "[t]he vast majority of the allegations that have been brought forward have been validated by witness statements" and "[t]he two that [were] not are being given presumptive validation, based on the other items that have been found to be true." (*Id.* at 138–39). The allegations that were determined to be valid by Defendant's investigation included: (1) Plaintiff telling staff that they could not go to Billingsley and must report their concerns only to Plaintiff; (2) Plaintiff telling employees that she was being discriminated against; (3) Plaintiff "correct[ing] employees in front of other employees" "on a regular and ongoing basis"; (4) Plaintiff speaking "negatively" about Billingsley "on a regular basis" and "stat[ing] that he got his position as a favor to his brother from the Mayor"; (5) Plaintiff "speak[ing] in a negative manner about, what she call[ed], 'legacy employees,'" i.e., those employees who were hired prior to Plaintiff; (6) Plaintiff commenting "negatively" about an "employee's education" in front of other employees; (7) Plaintiff "speak[ing] negatively about another department"; and (8) Plaintiff "stat[ing] in a group setting that she knew how to get rid of union employees" as "a threat against [their] job security." (*Id.*). Additional allegations that were found to be presumptively valid included: (1) Plaintiff telling Fundora that he may not make reports to Human Resources because that is only available to managers and not employees; and (2) Plaintiff telling Fundora that Billingsley and McCrimmon "were discriminating against him and wanted to extend his probation"

and then" chang[ing] the story" and telling Fundora that she was the one who wanted to extend his probation.[15] (*Id.* at 138).

As a result of the investigation, Billingsley decided to terminate Plaintiff, a decision with which McCrimmon and McCullion concurred. (Doc. 22-5 at 70). On November 20, 2020, Plaintiff was terminated. (*Id.* at 123). The stated reasons for Plaintiff's termination were that Plaintiff (1) "failed to behave in the manner outlined by the [PIP]"; (2) "engaged in abusive language or threatening behavior towards a fellow employee or supervisor";[16] (3) "intentionally misrepresented or lied about work-related activities"; and (4) was "insubordinate or purposefully failed to carry out orders or instructions of [her] supervisor." (*Id.* at 123–24).

---

[15] The full version of this allegation, as told by Fundora in his contemporaneous emails is that as Fundora was nearing the end of his probation period, Plaintiff was "constantly" telling him that she would "need to extend [his] probation because [Billingsley] is a racist and . . . wanted to get rid of [Fundora]." (Doc. 22-8 at 229). "This didn't sound right to [Fundora]," so he advised Plaintiff that he would make a report to Human Resources about it. (*Id.*). Plaintiff "stopped" Fundora and told him not to and said, "I will help you, you'll see." (*Id.*). On September 10, 2020, Plaintiff told Fundora to go into a conference room with her and "said the same story about" Billingsley discriminating against Fundora and wanting to extend his probation. (*Id.*). Fundora said that he "got ready to stand from [his chair]" and told Plaintiff that he was going to report the issue to Human Resources "right now." (*Id.*). Plaintiff then said "No! It is me who wants to extend you." (*Id.*). Plaintiff then explained that Fundora could not report her for discrimination because she is "black." (*Id.*).

[16] The record contains a dispute of fact regarding whether Plaintiff abused and threatened her subordinates and/or supervisors. (*Compare, e.g.*, Doc. 22-5 at 124 (concluding that Plaintiff "engaged in abusive language or threatening behavior towards a fellow employee or supervisor) *with* Doc. 29-1 at 10 (Plaintiff's Declaration stating that she "was not abusive to [her] subordinates or coworkers")). However, this dispute is not material because the record demonstrates that Billingsley, Defendant's decisionmaker, *believed* that Plaintiff was abusive and threatening towards her subordinates based on the complaints received, as detailed herein. *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991); *Hawkins v. Ceco Corp.*, 883 F.2d 977, 980 n.2 (11th Cir. 1989); *Smith v. Papp Clinic, P.A.*, 808 F.2d 1449, 1452–53 (11th Cir. 1987).

On November 23, 2020, Plaintiff filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"). (Compl., Doc. 1, at 4; Answer, Doc., 10, at 3). Plaintiff also appealed her termination decision through Defendant's Grievance Board, which determined by a vote of two to one that Defendant "should have applied progressive discipline" in accordance with internal policy prior to termination.[17] (Doc. 22-5 at 154). Plaintiff's termination was then "reduced to a demotion to the position of Purchasing Agent III," in addition to "a suspension without pay" for approximately six months.[18] (*Id.* at 155). Plaintiff informed Defendant that she would not be returning to work for Defendant, and Billingsley accepted her resignation. (May 17, 2021 Email, Doc. 22-11, at 2).

Following Plaintiff's resignation, an Amended Charge of Discrimination ("Amended EEOC Charge") was filed with the EEOC and Florida Commission on Human Relations on behalf of Plaintiff.[19] (Pl. Dep. Exs., Doc. 22-3, at 29–33).

---

[17] Kevin Edmonds, Defendant's Chief Administrative Officer, drafted a memorandum in response to the Grievance Board's decision to clarify "several misapprehensions that [the Grievance Board] included as part of their findings and conclusions" and attached that memorandum to the decision regarding Plaintiff's appeal because he "wanted to make sure that . . . future panels . . . didn't make the same mistakes." (Edmonds Dep., Doc. 22-9, at 6, 12–13; Doc. 22-10 at 2–3). However, the propriety of whether Defendant complied with its own internal policies has no bearing on the instant case.

[18] Billingsley was advised generally by the Grievance Board and the City Attorney's Office as to whether any disciplinary action could be applied following the decision of the Grievance Board. (Doc. 22-5 at 77). Billingsley then made the decision as to what that the discipline would be and determined that the demotion and suspension were appropriate. (*Id.* at 78, 85, 88, 90, 91). He discussed his decision with McCrimmon, McCullion, and "most likely" Banks. (*Id.* at 78, 82, 88, 90, 91).

[19] Plaintiff initially stated in her deposition that she did not file the Amended EEOC Charge and that Defendant filed it on her behalf. (Doc. 22-1 at 173). She then stated that she could not

Plaintiff filed then instant case, alleging three counts based on race discrimination—hostile work environment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Florida Civil Rights Act of 1992 ("FCRA"), Fla. Stat. § 760.01 *et seq.* (Count I); disparate treatment in violation of Title VII and the FCRA (Count II); and retaliation in violation of Title VII and the FCRA (Count III). (Doc. 1 at 12–21). Defendant moves for summary judgment on all claims. (*See generally* Doc. 21).

## II.   LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it may "affect the outcome of the suit under the governing law." *Id.*

"The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be

---

remember if she drafted the statement of facts therein and did not know if it was her signature on the document. (*Id.*). Later in her deposition, Plaintiff stated that she "provided the information" in the Amended EEOC Charge and that it was drafted by her attorney. (*Id.* at 178). For the purposes of this Order, it is not material who drafted the document on behalf of Plaintiff. The first page of the Amended EEOC Charge states: "I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief" and it is signed "under penalty of perjury" by Plaintiff. (Doc. 22-3 at 29). Therefore, the Court will consider it.

decided at trial." *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1313–14 (11th Cir. 2007). In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). However, when faced with a "properly supported motion for summary judgment," the nonmoving party "must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997) (citing *Anderson*, 477 U.S. at 248–49 (1986)); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "[T]he proper inquiry on summary judgment is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Stitzel v. N.Y. Life Ins. Co.*, 361 F. App'x 20, 22 (11th Cir. 2009) (quoting *Anderson*, 477 U.S. at 251–52). Put another way, a motion for summary judgment should be denied only "[i]f reasonable minds could differ on the inferences

arising from undisputed [material] facts." *Pioch v. IBEX Eng'g Servs.*, 825 F.3d 1264, 1267 (11th Cir. 2016) (quoting *Allen*, 121 F.3d at 646).

## III.  ANALYSIS

### A.  Legal Framework

#### 1.  Title VII and the FCRA

Title VII "makes it unlawful for an employer 'to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Lewis v. City of Union City*, 918 F.3d 1213, 1220 (11th Cir. 2019) (quoting 42 U.S.C. § 2000e-2(a)(1)). Title VII also "prohibits employers from retaliating against an employee 'because [s]he has opposed any practice made an unlawful employment practice by [Title VII], or because [s]he has made a charge . . . under [Title VII].'" *Tolar v. Bradley Arant Boult Cummings, LLP*, 997 F.3d 1280, 1289 (11th Cir. 2021) (quoting 42 U.S.C. § 2000e-3(a)). Finally, courts have interpreted Title VII to "protect[] employees from being required 'to work in a discriminatorily hostile or abusive environment.'" *Nichols v. Volunteers of Am., N. Ala., Inc.*, 470 F. App'x 757, 760 (11th Cir. 2012) (quoting *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1244 (11th Cir. 1999) (en banc)).

Similarly, under the FCRA, "[i]t is an unlawful employment practice for an employer . . . [t]o discharge or to fail or refuse to hire any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status." Fla. Stat. § 760.10(1)(a). The FCRA also prohibits retaliation and protects employees from a hostile work environment in the same manner as Title VII. *Id.* § 760.10(7); *Mosley v. MeriStar Mgmt. Co.*, LLC, 137 F. App'x 248, 252 (11th Cir. 2005) (citing *Wilbur v. Corr. Servs. Corp.*, 393 F.3d 1192, 1195 n.1 (11th Cir. 2004)) (providing for a hostile work environment claim under the FCRA).

"[D]ecisions construing Title VII apply to the analysis of FCRA claims." *Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1325 (11th Cir. 2020) (citing *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1387, 1389–90 (11th Cir. 1998)); *Harper*, 139 F.3d at 1387 ("The Florida courts have held that decisions construing Title VII are applicable when considering claims under the [FCRA], because the Florida act was patterned after Title VII."). Indeed, "[n]o Florida court has interpreted the Florida statute to impose substantive liability where Title VII does not." *Harper*, 139 F.3d at 1387. Therefore, Plaintiff's Title VII and FCRA claims will be analyzed together applying Title VII legal authority.

## 2.    McDonnell Douglas

When a Title VII or FCRA disparate treatment claim is based on circumstantial evidence, as is the case here, the Eleventh Circuit dictates that the three-part *McDonnell Douglas* burden-shifting framework applies. *Johnson*, 948 F.3d at 1325 (citing *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1202 (11th Cir. 2013)); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The Eleventh Circuit applies the same burden-shifting framework to Title VII and FCRA retaliation claims. *Tolar*, 997 F.3d at 1289.

Under this framework, the plaintiff has the initial burden to establish a prima facie case of discrimination or retaliation. *McDonnell Douglas*, 411 U.S. at 802. "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). If the plaintiff establishes a prima facie case by a preponderance of the evidence, a presumption of discrimination arises. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253–54 (1981).

Once the plaintiff has presented a prima facie case and its attendant presumption arises, the burden "shift[s] to the employer to articulate some legitimate, nondiscriminatory reason" for its actions. *McDonnell Douglas*, 411 U.S. at 802. If the employer meets this burden, "the presumption of discrimination is eliminated and the plaintiff has the opportunity to come forward with evidence . . .

sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (quotation omitted). "An employer's stated reason is not a pretext unless it is shown that both: (1) the reason was false; and (2) the real reason was unlawful." *Vega v. Invsco Grp., Ltd.*, 432 F. App'x 867, 871 (11th Cir. 2011) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)). "If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim." *Chapman*, 229 F.3d at 1024–25.

However, "establishing the elements of the *McDonnell Douglas* framework is not . . . the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). If, despite failing to precisely establish the *McDonnell Douglas* elements, the plaintiff "presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent"—i.e., "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker"—the plaintiff can still survive summary judgment. *Id.* (quotation and footnote omitted).

## B.     Count I—Hostile Work Environment[20]

Count I asserts a claim of hostile work environment under Title VII and the FCRA. (Doc. 1 at 12–15). "A hostile work environment claim under Title VII is established upon proof that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Nichols*, 470 F. App'x at 760 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)). "To establish a hostile work environment claim, a plaintiff must show that: (1) [s]he belongs to a protected group; (2) [s]he suffered unwelcome harassment; (3) the harassment was based on a protected characteristic of the employee . . . ; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) the employer is responsible for that environment under a theory of either direct liability or vicarious liability." *Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1153 (11th Cir. 2020) (citing *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)). Defendant challenges the third and fourth elements.

---

[20] It does not appear that the Eleventh Circuit dictates application of the *McDonnell Douglas* framework to a hostile work environment claim. *Williams v. Birmingham City Sch.*, Civil Action No. 2:20-cv-2006-ACA, 2022 U.S. Dist. LEXIS 171544, at *11 (N.D. Ala. Sep. 22, 2022). Nonetheless, the result here would be the same whether or not *McDonnell Douglas* applies to this claim.

As to the third element, Defendant argues that there is no evidence on the record supporting a claim by Plaintiff that any harassment was racially motivated. In response, Plaintiff cites to a portion of her deposition where she is discussing a conversation she had with McCrimmon where McCrimmon accused Plaintiff of being "aggressive and overbearing." (Doc. 22-1 at 132). Plaintiff concludes in her deposition that despite McCrimmon never using any racial slurs or racially charged language, that statement made by McCrimmon was racially motivated because "[i]t's all built around the stereotype for Black women that we're hostile, that we're overbearing." (*Id.*). This is the sole evidentiary basis that Plaintiff relies on to demonstrate that the workplace harassment was racially motivated.

Plaintiff cites two out-of-circuit district court cases to support the proposition that an "Angry Black Woman" stereotype is sufficient to support a claim of racial discrimination. *Heard v. Bd. of Trs. of the Jackson Cmty. Coll.*, No. 11-cv-13051, 2013 U.S. Dist. LEXIS 4490, at *33 (E.D. Mich. Jan. 11, 2013); *Young v. Control Sols., LLC*, No. 15-cv-3162, 2017 U.S. Dist. LEXIS 93681, at *12–13 (N.D. Ill. June 19, 2017). *Young* summarizes this doctrine as follows:

> Angry and its synonyms are, standing alone, innocent words with no racial connotation. They are words, however, with a long history as part of a stereotypical depiction of black women that can trace its roots to the institution of slavery. . . . [T]here appears to be an academic consensus regarding both the resilience of this stereotype within American society and its continued detrimental impact upon black women. When a word or

> concept is so pervasively and enduringly linked to a derogatory stereotype, its use to reference individuals traditionally subject to the stereotype inherently raises the specter of motivation or bias.

*Young*, 2017 U.S. Dist. LEXIS 93681, at *12–13; *see also Heard*, 2013 U.S. Dist. LEXIS 4490, at *33 (describing "the Angry Black Woman" stereotype, which characterizes "black women as rude, loud, malicious, stubborn, and overbearing").

First, the Court will note the obvious—these out-of-circuit district court cases are not binding here.[21] Second, these district court cases carry little persuasive value because they do not even rely on any binding legal authority within their own circuits. *Young*, 2017 U.S. Dist. LEXIS 93681, at *12–13; *Heard*, 2013 U.S. Dist. LEXIS 4490, at *33.

In the Eleventh Circuit, discrimination on the basis of the application of a stereotype to a protected class is actionable under Title VII. *Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)) (discussing sex-based discrimination under Title VII). Within this

---

[21] To the extent that the Court considers these cases, they are also factually distinguishable. *Young* concluded, based on the record in that case, that the PIP at issue there included "repeated descriptions of Young as angry," while the defendants "offered limited evidence . . . to support the PIP's characterization of Young's conduct," and thus there was a disputed issue of material fact "as to whether the comments contained in the PIP were racially motivated." *Young*, 2017 U.S. Dist. LEXIS 93681, at *12–13. Here, Plaintiff references a single incident of McCrimmon referring to her as "aggressive and overbearing," whereas in *Young*, that description was pervasive in the evidence. Here, the feedback provided to Plaintiff other than this single instance did not include similar language which could evoke the stereotype argued by Plaintiff. (*See, e.g.*, Doc. 22-2 at 20–21 (directing Plaintiff to "ensure the overall tone" with staff was "professional, genuine, and positive")).

framework, a handful of district courts within the Eleventh Circuit have considered express references of a plaintiff being "an angry black woman" as evidence that would allow a reasonable jury to infer that the plaintiff was discriminated against on the basis of race. *Robinson v. City of Atlanta*, No. 1:10-CV-02036-AT-AJB, 2012 U.S. Dist. LEXIS 191802, at *34 (N.D. Ga. July 27, 2012), *report and recommendation adopted by* 2012 U.S. Dist. LEXIS 191808, at *5 (N.D. Ga. Aug. 31, 2012); *DeBose v. Univ. of S. Fla. Bd. of Trs.*, No. 8:15-cv-2787-T-17AEP, 2017 U.S. Dist. LEXIS 160841, at *7–8, 24–25 (M.D. Fla. Sep. 29, 2017); *Peeler v. Premier Ambulatory Surgical Ctr., LLC*, No. 1:17-cv-2923-AT, 2019 U.S. Dist. LEXIS 250391, at *6 (N.D. Ga. Mar. 29, 2019). However, the distinction between those cases and the instant case is that in those cases, the plaintiffs "were expressly labeled as 'angry black women,'" whereas here, "the Court is not persuaded that being overly critical of [the plaintiff] and referring to [her] as 'angry' or the like, without more, support an inference of discrimination." *Kimble v. Quality Assist, Inc.*, No. 1:19-cv-02549-JPB, 2022 U.S. Dist. LEXIS 50133, at *22–23 (N.D. Ga. Mar. 21, 2022). Thus, Plaintiff has failed to present any evidence upon which a reasonable jury could conclude that any harassment of Plaintiff was based on her race, and the Court will grant summary judgment to Defendant on Count I.

## C.    Count II—Disparate Treatment

Count II asserts a claim of disparate treatment under Title VII and the FCRA. (Doc. 1 at 15–17). To establish a prima facie case of disparate treatment, a plaintiff must show: "(1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated 'similarly situated' employees outside her class more favorably." *Lewis*, 918 F.3d at 1220–21 (citing *McDonnell Douglas*, 411 U.S. at 802). Defendant challenges only the last element.

Defendant argues that Plaintiff has not identified any similarly situated employees outside of her class that were treated more favorably. Under this element, it is Plaintiff's burden to "present evidence of a comparator—someone who is 'similarly situated in all material respects.'" *Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022) (quoting *Lewis*, 918 F.3d at 1224). "Although what constitutes a 'material' similarity or difference will differ from case to case, ordinarily a similarly situated comparator and the plaintiff will: have engaged in the same basic conduct or misconduct, be subject to the same employment policies, have the same supervisor(s), and share an employment or disciplinary history." *Id.* (citing *Lewis*, 918 F.3d at 1227–28). Plaintiff did not respond to this argument, so she has failed to meet her burden of presenting evidence of a comparator, and Defendant has met its

burden to be entitled to summary judgment on Count II.[22] *See also* M.D. Fla. R.

3.01(c); *Gailes v. Marengo Cnty. Sheriff's Dep't*, 916 F. Supp. 2d 1238, 1244 n.12

(S.D. Ala. 2013) ("A plaintiff that fails to address a claim challenged by a defendant

does so at its peril, both because the Court may not detect defects in the defendant's

position . . . and because . . . the Court will not on its own raise arguments to counter

the defendant's case."); *Brown v. Platinum Wrench Auto Repair, Inc.*, No. 8:10-cv-

2168-T-33TGW, 2012 WL 333803, at *1 (M.D. Fla. Feb. 1, 2012) (after a party

failed to respond, the court treated motion for summary judgment as unopposed).

### D.    Count III—Retaliation

Count III asserts a claim of retaliation under Title VII and the FCRA. (Doc. 1

at 17–21). To establish a prima facie case of retaliation under Title VII or the FCRA,

a plaintiff must show that: (1) she engaged in a statutorily protected expression; (2)

she suffered an adverse employment action; and (3) there was a causal link between

the first two elements. *Johnson*, 948 F.3d at 1325.

For the purposes of efficiency, the Court assumes *arguendo* that Plaintiff has

established a prima facie case of retaliation. The adverse employment actions

identified by Plaintiff are: (1) Defendant's initial termination of Plaintiff on

---

[22] Additionally, even if Plaintiff were able to establish a prima facie case of disparate treatment, as discussed below, Defendant has met it burden of production of demonstrating a legitimate, nondiscriminatory reason for its adverse employment actions against Plaintiff, and Plaintiff has not demonstrated pretext, so Defendant would also be entitled to summary judgment as to Count II on that basis.

November 20, 2020, and (2) Defendant's demotion and approximately six-month suspension without pay of Plaintiff following the Grievance Board's decision. (Doc. 29 at 18 n.6).

Operating under the attendant presumption of discrimination, the Court moves to the next step in the *McDonnell Douglas* framework, which requires Defendant "to articulate some legitimate, nondiscriminatory reason" for its actions. *McDonnell Douglas*, 411 U.S. at 802. Defendant's "'exceedingly light' burden" at this stage "is one of production, not persuasion." *Flournoy v. CML-GA WB, LLC*, 851 F.3d 1335, 1339 (11th Cir. 2017) (quoting *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983)).

Defendant's proffered legitimate, nondiscriminatory reason for its original termination of Plaintiff was that "her ongoing abusive treatment of subordinates persisted even after a PIP."[23] (Doc. 21 at 20; *see also* Doc. 30 at 7 (noting "complaints by ten subordinates and other employees, . . . misbehavior that continued after Plaintiff completed the PIP . . . and two resignations due to Plaintiff's mistreatment")).[24] As to the original termination, Defendant has met its exceedingly light burden. The record is replete with complaints by Plaintiff's subordinates

---

[23] The Court clarifies for the record that this is Defendant's *belief* regarding Plaintiff's abusive treatment of her subordinates based on the complaints that Defendant was receiving from those employees; the Court makes no findings as to whether that belief was correct.

[24] (*See* Doc. 22-8 at 308–09 (showing a table of these complaints)).

regarding Plaintiff's poor treatment of them. (*See, e.g.*, Doc. 22-1 at 298 (Bowman's resignation letter citing specifically Plaintiff's "belittle[ing]" her in front of her coworkers as the reason for her resignation), 309 (noting that Henao's stated reason for resigning was the "disrespectful treatment" by Plaintiff); Doc. 22-5 at 138–39 (listing the substantiated allegations of Defendant's Labor Relations investigation into Plaintiff's conduct)).[25] And such "complaints from subordinates about [a supervisor]'s condescending and aggressive managerial style," even after intervention by the employer, "would motivate a reasonable employer to terminate [the supervisor]" and thus are a legitimate, nondiscriminatory reason for termination. *Vahey v. Philips Elecs. N. Am. Corp.*, 461 F. App'x 873, 875 (11th Cir. 2012); *Barthlow v. Jett*, 303 F. App'x 723, 724 (11th Cir. 2008) (affirming the district court and holding that it was "clear that [the defendant] had a legitimate reason for firing [the plaintiff]" because "[t]he record [wa]s replete with evidence adduced by [the defendant] that [the plaintiff] had an extensive history of reprimands for unprofessional conduct[, including] . . . numerous reprimands for abusive and harassing incidents with co-workers"); *Jones v. Lumberjack Meats, Inc.*, 680 F.2d 98, 101 (11th Cir. 1982) (affirming the district court and holding that a "poor

---

[25] To be clear, Plaintiff states that she "was not abusive to [her] subordinates" and "never engaged in any unprofessional behavior with [her] staff." (Doc. 29-1 at 10). But Plaintiff's testimony and declaration regarding her own view of her conduct is not material to Defendant's proffered reason, instead, it goes to pretext and will be addressed in that section.

relationship with other company employees" is a "valid and nondiscriminatory" reason for termination).

Defendant's proffered reason for the adverse employment actions following the Grievance Board's decision was twofold—Plaintiff "should not be in a position that supervises employees" based on her previous treatment of subordinates, and Plaintiff's "former position of Assistant Chief Procurement Officer had been eliminated."[26] (Doc. 21 at 20). Defendant has also met its exceedingly light burden here and only needs the former of the two reasons. Plaintiff's purported treatment of her subordinates—as adduced through the numerous complaints Defendant received from Plaintiff's subordinates—was unacceptable in Defendant's workplace. For the same reasons discussed above, this is a legitimate, nondiscriminatory reason supporting Plaintiff's suspension without pay and demotion.

The presumption of discrimination has thus been eliminated, and the burden next shifts back to Plaintiff "to come forward with evidence . . . sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer" were pretextual. *Chapman*, 229 F.3d at 1024. This requires Plaintiff to demonstrate, *inter alia*, that Defendant's reasons for its actions were false. *Vega*, 432 F. App'x at 871.

Plaintiff first argues that "McCrimmon was lying in wait for an excuse to terminate [Plaintiff]" and found that opportunity when Fundora "made allegations

---

[26] (*See* Doc. 22-5 at 92–93).

about [Plaintiff] to save his job." (Doc. 29 at 18). This argument fails both factually and legally. Factually, first, it was Billingsley—not McCrimmon—who made the decision to terminate Plaintiff. Second, McCrimmon did not begin her role as Plaintiff's second level supervisor until sometime between mid-December 2019 and early-January 2020, *after* both Bowman and Henao both resigned due to Plaintiff's treatment of them. Prior to this time, McCrimmon had no supervisory authority over Plaintiff. (Doc. 22-7 at 9). Thus, to give credence to Plaintiff's argument would require the Court to believe that McCrimmon—*prior* to taking her role as Plaintiff's second level supervisor—conspired with Plaintiff's subordinates to blame their departure on Plaintiff's treatment. There is no evidence on the record that would permit a reasonable juror to reach such a conclusion. Finally, legally, the authority Plaintiff cites in support of her argument is non-binding, out-of-circuit authority and not persuasive due to the drastically differing factual scenario presented therein. *Hamilton v. GE*, 556 F.3d 428, 436–38 (6th Cir. 2009).

Relatedly, Plaintiff contends that the Labor Relations investigation was a "sham" and not a real investigation because Defendant was preparing draft termination documents prior to completion of the investigation.[27] (Doc. 29 at 19). First, just because Defendant began preparing draft termination documents prior to

---

[27] Relatedly, Plaintiff argues that "Labor Relations manipulated the context of witness testimony" in the investigation. (Doc. 29 at 20). This argument fails for the same reasons.

completion of the investigation does not equate to a conclusion that the investigation was sham. Second, even assuming *arguendo* that the Labor Relations investigation was predetermined, Plaintiff has not pointed to any evidence in the record that Billingsley—the decisionmaker who terminated Plaintiff—knew that the investigation was tainted or relied on the Labor Relations report in bad faith. The Eleventh Circuit has "held that where an employer relies on a report of an employee's alleged wrongdoing, the question is not whether the report is accurate, but rather whether the employer 'reasonably believed' that it was." *Gogel v. Kia Motors Mfg. of Ga.*, 967 F.3d 1121, 1152 (11th Cir. 2020) (quoting *Hawkins v. Ceco Corp.*, 883 F.2d 977, 980 n.2 (11th Cir. 1989)). The undisputed record supports a finding that Billingsley reasonably believed that the Labor Relations investigation supported his termination decision.

Plaintiff next argues that "Billingsley knew that [Fundora] was making false claims of discrimination"[28] to save his job. (Doc. 29 at 19). There is a dispute of fact as to whether Billingsley knew that Fundora's initial claim may have been asserted to save his job. (*See* Doc. 22-5 at 46–47, 53–54, 126–32). However, this dispute is not material because even if Fundora's initial complaint was motivated by a desire to save his job or prevent his probation from being extended, his complaints were

---

[28] To be clear, Fundora was claiming abusive treatment by his supervisor, not racial discrimination. (*See* Doc. 22-5 at 133–34 (listing Fundora's complaints)).

substantiated by other employees during the Labor Relations investigation.[29] There is no evidence on the record supporting any ulterior motives from these other employees. Thus, even if Billingsley knew that Fundora's initial complaint was motivated by a desire to save his job, Billingsley could still reasonably rely on the Labor Relations investigation, which included substantiated findings after interviews with five employees other than Fundora. *Gogel*, 967 F.3d at 1152.

Next, Plaintiff contends that "[m]any of the purported reasons for [Plaintiff]'s termination are not logical." (Doc. 29 at 20). But it is well established that when an employer's "proffered reason is one that might motivate a reasonable employer"— as has been clearly established here—"the employee cannot succeed by simply quarreling with the wisdom of that reason." *Tolar*, 997 F.3d at 1298 (quoting *Chapman*, 229 F.3d at 1030).

Finally, Plaintiff argues that Defendant violated the decision of its Grievance Board by demoting Plaintiff and suspending her without pay. This argument conflates a purported violation of Defendant's internal policies with a legal violation of Title VII or the FCRA. Even if Defendant had outright terminated Plaintiff following the Grievance Board's decision—in violation of its own policies—that

---

[29] Fundora's complaint can also be considered immaterial because the other complaints alone, including Bowman's and Henao's, whose documented reason for leaving Defendant's employ was Plaintiff's treatment, are a sufficient legitimate, nondiscriminatory reason to support Plaintiff's termination.

would not equate to a violation of Title VII or the FCRA because Defendant has proffered a legitimate, nondiscriminatory reason for its adverse employment actions against Plaintiff. *Smith v. Papp Clinic, P.A.*, 808 F.2d 1449, 1452–53 (11th Cir. 1987) ("If the employer fired an employee because it honestly believed that the employee had violated a company policy, even if it was mistaken in such belief, the discharge is not 'because of race.'). And Plaintiff has failed to come forward with evidence sufficient to permit a reasonable factfinder to conclude that the reason given by Defendant was not the real reason for Plaintiff's termination, demotion, and suspension.[30] *Chapman*, 229 F.3d at 1024. Thus, Defendant is entitled to summary judgment on Count III.

## IV. CONCLUSION

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1. Defendant's Motion for Summary Judgment (Doc. 21) is **GRANTED**.

2. The Clerk is directed to enter judgment in favor of Defendant and against Plaintiff, providing that Plaintiff shall take nothing in her claims against Defendant.

---

[30] As noted above, as an alternative to the *McDonnel Douglas* framework, a plaintiff may also survive summary judgment by presenting a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker. *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). However, Plaintiff has not made this argument in briefing, and the Court also does not independently discern record evidence that would support such an argument.

3. The Clerk is directed to close this case.

**DONE** and **ORDERED** in Orlando, Florida on November 15, 2023.



CARLOS E. MENDOZA
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record